**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

GRACE CHRISTIAN FELLOWSHIP,

    Plaintiff,

    v.                                Case No. 07-C-0348

KJG INVESTMENTS INC. and
COLONY INSURANCE COMPANY,

    Defendants.

# DECISION AND ORDER

## NATURE OF CASE

Plaintiff Grace Christian Fellowship (Grace) filed this action against KJG Investments, Inc. (KJG) and Colony Insurance Co. (Colony) under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972. The plaintiff also asserts state law claims of continuing trespass, nuisance, and negligence.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

On September 20, 2007, the plaintiff filed a motion for a preliminary injunction. The court held an evidentiary hearing on November 15, 2007, which was continued on November 21, 2007, January 23, 2008, January 31, 2008, February 1, 2008, April 9, 2008, and August 4, 2008. On April 7, 2008, the plaintiff filed a motion to present rebuttal testimony of three witnesses. The proposed testimony involved in part February 11, 2008, groundwater tests

results, results of sub-slab samples and an indoor air sample test conducted on February 12, 2008, a 24-hour indoor air test conducted in the Grace building on March 1-2, 2008, using a SUMMA canister. The defendants objected to the rebuttal testimony, asserting that the testimony was based on new evidence and testing. After the April 9, 2008, hearing and the plaintiff's further clarification of the proposed testimony, the court determined that the plaintiff wanted to present new evidence which would further extend resolution of the preliminary injunction motion. Therefore, the court concluded that any rebuttal testimony based on new testing would not be permitted in the preliminary injunction proceeding. See Court's Decision and Order of June 12, 2008, at 10-11. The plaintiff presented rebuttal testimony at the August 4, 2008, continued hearing.

The following individuals testified for the plaintiff at the preliminary injunction hearing: Pastor Frank Susler, pastor of Grace Christian Fellowship; James Drought of Shaw Environmental & Infrastructure, Inc. [Shaw Environmental] a hydrogeologist; Theodore Hogan, Ph.D., who has his doctorate in public health with a concentration on industrial hygiene; Robert Thiboldeaux, Ph.D., who is employed with the Wisconsin Department of Health and Family Services (DHFS), Division of Public Health and has his doctorate in environmental toxicology; Keith Hitzke, North Shore Environmental Construction

The following persons testified for the defendants: Robert Toumanen, Hydro-Environmental Technologies, a certified industrial hygienist, safety professional and professional auditor; Raghu Singh, Ph.D., OM Enterprises, Inc., who has his doctorate in microbiology/biochemistry; Raymond Tierney, a hydrogeologist with BT Squared, a civil and environmental engineering firm.

The parties requested to file post-hearing briefs on the motion. Thereafter, the parties advised the court that they were engaged in settlement discussions and requested that the

court not issue its decision on the motion for a preliminary injunction pending completion of the settlement discussions. When the settlement discussions were not successful, the parties requested that the court issue its decision on the motion.

During the course of the continued hearings on the preliminary injunction motion, on January 21, 2008, the plaintiff filed a motion seeking leave to file an amended complaint, including adding an additional defendant, PSK Investments, LLC, the current owner of the gas station. On June 12, 2008, the court denied the motion without prejudice and advised the plaintiff that the motion could be renewed at the request of the plaintiff. The plaintiff filed the proposed amended complaint on July 20, 2009. The preliminary injunction motion and the motion to amend the complaint will be addressed herein.

## UNDISPUTED RELEVANT FACTS

A gas station has been located at 9922 West Capitol Drive (KJG Site) since at least 1955. The station has a history of gasoline spills including a significant petroleum spill which occurred in October 1983. On January 22, 1996, the Wisconsin Department of Natural Resources (WDNR) issued a responsible party (RP) letter to then-station owner Mobil Oil requiring that the releases be addressed.

In 1996, defendant KJG Investments, Inc. (KJG) purchased the property and retained K. Singh and Associates (K. Singh) to assist in investigating and remediating the KJG Site. Dr. Raghu Singh worked on the KJG Site while he was employed by K. Singh. In 1997, some impacted soils were excavated from the KJG Site.

K. Singh's 1999 Interim Remedial Action Report identified a preferential migration pathway leading eastward from the KJG Site through the alleyway to the north and to the adjacent property located at 9900 West Capitol Drive (Grace Site). (October 15, 2007, Affidavit of Raghu Singh, Ph.D., Exh. C) By January 2000, the KJG Site was remediated to

a level approved by the WDNR and the site was closed. When closing the site in 2000, the WDNR and Wisconsin Department of Commerce set a cleanup goal for 1000 parts per billion (ppb) benzene in soils and granted an exemption for levels of benzene in groundwater above the Residential Cleanup Limit (RCL). The benzene levels in the groundwater also exceeded the state's Preventive Action Limit (PAL) and Enforcement Standard.

When the plaintiff purchased the Grace Site in July 2001, it was not aware that the property was contaminated from the gasoline spills which had occurred on the KJG Site and had migrated to the Grace Site. The plaintiff also was not aware that the previous owner of the Grace Site discovered gasoline in the basement sump or that vapors had intruded into the building's basement where the plaintiff eventually located its school classrooms.

Between April 20, 2006, and April 26, 2006, another gasoline spill (New Spill) occurred at the KJG Site and migrated to the Grace Site. The New Spill migrated from the KJG Site along the alleyway and into footing drain tiles and the basement sump at the Grace Christian Fellowship (Grace) building. On April 26, 2006, gasoline odors emanated from Grace's basement and some teachers and students complained of headaches, dizziness and nausea. Some people also were coughing. The next day, the City of Milwaukee Fire Department (MFD) declared the Grace building uninhabitable, set up an emergency venting system, and ordered the electricity be shut off to avoid an explosion. Additionally, on April 27, 2006, the WDNR and the City of Milwaukee Health Department and Department of Neighborhood Services visited the Grace Site.

The plaintiff hired an emergency response contractor to pump the free product from Grace's footing drain tiles, excavate contaminated soil from along a portion of its west wall and install a blower to address vapors from contamination that could not be removed. Additionally, a second blower and generator were set up in case of electrical failure. On May 1, 2006,

DHFS determined that the building was safe and allowed the plaintiff to reoccupy and use its building.

On May 4, 2006, the WDNR issued a responsible party (RP) letter to Jagdisher Singh, owner of defendant KJG. Defendant KJG, which owned the KJG Site at the time of the spill, hired an environmental consultant, Dr. Raghu Singh, who was present at the emergency remediation. Dr. Singh continues to work at the KJG and Grace Sites.

A letter from the Wisconsin Department of Health and Family Services (DHFS) dated December 14, 2006, stated that the DHFS and the City of Milwaukee Health Department had tested air samples at the Grace site using passive dosimeter sampling badges and found that the results "did not find an indoor air problem of health concern." (Exh. 100 at 1; Testimony of Robert Toumanen, Transcript [Tr.] at 376). The letter further recommended that the basement sumps be covered and sealed.

A scientific chemical analysis was conducted by Triton Analytics Corporation with three groundwater samples provided by Shaw Environmental which were taken from the basement sump and borings under the sub-slab at the Grace Site. In a letter report dated March 7, 2007, Triton stated that test results showed that dissolved hydrocarbon material was found at one of the three locations and that this material had been degraded by evaporation and contact with ground water and had been there for greater than five to ten years. (Exh. 101; Testimony of James Drought, Tr. at 155-156).

Levels of benzene measured in the monitoring wells outside the Grace property exceed the state's Preventative Action Limit of 0.5 ppb and Residual Cleanup Limit of 5.5 ppb.

## MOTION FOR PRELIMINARY INJUNCTION

In its motion for a preliminary injunction, the plaintiff seeks an order pursuant to Fed. R. Civ. P. 65(a) and 42 U.S.C. § 6972(a)(1)(B) requiring defendant "KJG to take specific investigatory and remedial steps to protect the children, teachers, staff, church members and employees who use Grace's building, from the gasoline saturated soils and 'free product' beneath Grace's building and the gasoline vapors which are emanating from under Grace's basement." (Plaintiff's Memorandum in Support of its Motion for Preliminary Injunctive Relief filed on September 20, 2007, [Plaintiff's Memorandum] at 1-2). The plaintiff states that it has meet the requirements for a preliminary injunction under RCRA's citizen suit provision and Fed. R. Civ. P. 65. The plaintiff maintains that an injunction is necessary because defendant KJG has not taken the steps required by state and local government entities to protect pupils, teachers and parents who utilize Grace's basement school from the imminent hazard to human health created by its gasoline spill. The plaintiff further asserts that the court has the discretion to craft an injunctive order providing the relief it is requesting.

In response, defendant KJG asserts that the plaintiff does not face a threat of imminent or irreparable harm and, therefore, the court need not enter a preliminary injunction. Defendant KJG contends that the plaintiff has occupied the building since May 1, 2006, and there is no evidence of any present danger to the health and safety of patrons of the Grace building. Specifically, defendant KJG asserts that the contamination levels which are present at the Grace property are the same or lower than the level which existed when the site was closed in 2000 and when the plaintiff purchased the building in 2001.

With respect to the standard for the entry of a preliminary injunction, the plaintiff asserts that to obtain an injunction, a plaintiff must first demonstrate some likelihood of succeeding on the merits and that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. (Plaintiff's September 4, 2008, Memorandum of Law Supporting its Request for a Preliminary Injunction [Plaintiff's September 4, 2008, Memorandum] at 30) (quoting Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 [7th Cir. 1992]). The plaintiff asserts that it is highly likely it will succeed on the merits of its claims against defendant KJG.

The plaintiff maintains that it has demonstrated an entitlement to an injunction under RCRA and, therefore, a finding that it has a prima facie case under RCRA is warranted. Moreover, the plaintiff asserts that because the harm to the plaintiff is "sufficiently serious," it need only establish a fair chance of success on the merits. See Plaintiff's September 4, 2008, Memorandum at 31. The plaintiff further asserts that when a case is brought pursuant to an environmental or public health statute, such as RCRA, the primary focus shifts from the irreparable harm to concern for the general public interest. The plaintiff contends that the general public interest in this case is the health and welfare of the students and staff of the Grace elementary school. If a preliminary injunction is not granted, the plaintiff asserts that both the environment and Grace's students will continue to be irreparably harmed because defendant KJG refuses to take necessary action.

Defendant KJG asserts that the plaintiff's "speculative" evidence fails to satisfy its burden to prove that it is entitled to a mandatory preliminary injunction. (KJG Investments, Inc.'s Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction [KJG's Brief] at 2). Defendant KJG further asserts that the balance of the four-pronged preliminary injunction test does not weigh compellingly in the plaintiff's favor. Defendant KJG maintains that "the movant's demonstration of irreparable harm comprises 'the single most important prerequisite

for the issuance of a preliminary injunction.'" Id. at 6 (quoting Bell v. Howell Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42, 45 [2d Cir. 1983]).  Thus, defendant KJG asserts that the plaintiff must first demonstrate irreparable harm before the court needs to consider the other requirements for the issuance of an injunction.

Defendant KJG further asserts that even if the plaintiff demonstrates irreparable harm, it cannot establish a clear or substantial showing that it is likely to succeed on the merits of its RCRA claim.  Defendant KJG contends that the potential injury to it is greater than the potential injury to the plaintiff and "[t]he public's interest is not served by wasteful spending to remediate a problem that does not pose any danger, has the court making technical judgments that the WDNR [Wisconsin Department of Natural Resources] is more qualified to make, and allows for final relief at the preliminary stage." (KJG's Brief at 48).  Defendant KJG also states that the plaintiff has not shown that KJG is the proper party to address cleanup from the Old Spill and has not joined a necessary party, PSK Investments, Inc.

## ANALYSIS

"An equitable, interlocutory form of relief, 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1085 (7th Cir. 2008) (quoting Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 389 [7th Cir. 1984]).  In determining whether to issue a preliminary injunction, "a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." Girl Scouts of Manitou Council, Inc., 549 F.3d at 1085-86.

To survive the threshold phase, a party seeking a preliminary injunction must demonstrate that 1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to a final resolution of its claims; 2) traditional legal remedies would be inadequate;

and 3) its claim has some likelihood of success on the merits. Id. at 1086; see also, Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir. 2002). If the moving party fails to demonstrate any one of these three threshold requirements, the court must deny the injunction. Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086 (citing Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 [7th Cir. 1992]). If, however, the moving party can satisfy these conditions, the court then proceeds to the balancing phase of the analysis. Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086.

In this balancing phase, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." Id. "In so doing, the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" Id. (quoting Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 387 [7th Cir. 1984]). The court's balancing process also considers any effects that granting or denying the preliminary injunction would have on the public interest. Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086.

These traditional equitable principles apply even if the case is brought pursuant to an environmental statute which specifically authorizes injunctive relief as RCRA § 3008(a) does in this case. United States v. Bethlehem Steel Corp., 38 F.3d 862, 867 (7th Cir. 1994). "The Supreme Court has explained that so long as the statute does not evidence a congressional intent to deny courts their traditional equitable discretion, courts must undertake such a balancing analysis." Id. (citing Amoco Prod. Co. v. Village of Gambell, AK., 480 U.S. 531 [1987]; Weinberger v. Romero-Barcelo, 456 U.S 305 [1982]). The court of appeals for this circuit has held that there are two circumstances under which a court may enter an injunction

- 9 -

without balancing the equities: cases in which the defendant's conduct has been willful and cases in which the plaintiff is a sovereign and the activity may endanger the public health. Bethlehem Steel Corp., 38 F.3d at 867-68.

In Wilson v. Amoco Corp., 989 F. Supp. 1159, (D. Wyo. 1998), the district court, citing Bethlehem Steel Corp., 38 F.3d at 868 and U.S. E.P.A. v. Envtl. Waste Control, Inc., 917 F.2d 327, 332 (7th Cir. 1990), among other cases, stated: "[t]here is substantial authority that when a case is brought pursuant to an environmental or public health statute, including RCRA and the CWA, the primary focus shifts from irreparable harm to concern for the general public interest."[1] However, neither Bethlehem Steel Corp. nor Envtl. Waste Control,, Inc. support such a principle. Rather, as previously indicated, the court in Bethlehem Steel Corp. and in Envtl. Waste Control, Inc. held that a court must undertake a balancing analysis even in environmental cases unless the statute evidences a congressional intent to deny courts their traditional equitable discretion, the defendant's conduct has been willful or the plaintiff is a sovereign and the activity may endanger the public health. See Bethlehem Steel Corp., 38 F.3d at 867-68; Envtl. Waste Control, Inc., 917 F.2d at 332.[2]

In this case, RCRA does not evidence an intent to deny courts their traditional equitable discretion, the defendant did not engage in willful conduct and the plaintiff is not a sovereign. Accordingly, the court will undertake a traditional balancing analysis. However, because the preliminary injunction sought in this case seeks to disturb the status quo by requiring action by the defendants, the plaintiff must demonstrate entitlement to the injunction by heavy and

---

[1]The plaintiff, in its "Memorandum of Law Supporting its Request for a Preliminary Injunction," attributed the principle to the Bethlehem Steel Corp. court without citing the Wyoming district court case. If Bethlehem Steel Corp. actually supported the principle such citation would not be a problem. However, Bethlehem Steel Corp. does not support the principle the Wyoming district court cited it for.

[2]The other court of appeals case cited by the district court in Wilson stands for the same principles as Bethlehem Steel Corp. and Envtl. Waste Control, Inc. See United States v. Marine Shale Processors, 81 F.3d 1329, 1359 (5th Cir. 1996).

compelling evidence.  See SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991).

RCRA is a comprehensive statute governing the treatment, storage and disposal of hazardous waste.  City of Chicago v. Environmental Defense Fund, 511 U.S. 328 (1994).  Its primary purpose is to limit the harmful effects of hazardous waste "to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b).  A citizen may bring suit under RCRA "against any person, including . . . any past or present generator . . . who has contributed or who is contributing to the past or present handling . . . of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  Id. § 6972(a)(1)(B).  In Meghrig v. KFC Western, Inc., the Supreme Court noted:

> RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards.  RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, "so as to minimize the present and future threat to human health and the environment."

516 U.S. 479, 482 (1996) (internal citations omitted).

A private citizen suing under § 6972(a)(1)(B) can seek either a mandatory injunction or a prohibitory injunction.  Id. at 484.  The former "orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste" and the latter "'restrains' a responsible party from further violating RCRA."  Id.

Section 6972(a)(1)(B) permits a private party to bring suit only upon a showing that the solid or hazardous waste at issue "may present an imminent and substantial endangerment

to health or environment."  With respect to this restriction, the Supreme Court has concluded that:

> The meaning of this timing restriction is plain: An endangerment can only be 'imminent' if it "threaten[s] to occur immediately," Webster's New International Dictionary of English Language 1245 (2d ed. 1934), and the reference to waste which "may present" imminent harm quite clearly excludes waste that no longer presents such a danger.

Meghrig, 516 U.S. at 485-86.  Therefore, "[a] private party cannot recover the cost of a past cleanup effort under RCRA" whether the remedy is sought as "damages" or "equitable restitution."  Id. at 488.  The plain language of 42 U.S.C. § 6972(a) "bars damages and 'deliberately limits RCRA's remedies to injunctive relief.'"  Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 974 (7th Cir. 2002) (quoting Avondale Fed. Sav. Bank v. Amoco Oil Co., 170 F.3d 692, 694 [7th Cir. 1999]).

When originally enacted in 1976, RCRA created a cause of action for cases in which the "disposal of any solid waste or hazardous waste is presenting an imminent and substantial endangerment to health or the environment."  See Maine People's Alliance and Natural Resources Defense Council v. Mallinckrodt, Inc., 471 F.3d 277, 287 (1st Cir. Me. 2006) (quoting RCRA § 7003 [codified as amended at 42 U.S.C. § 6973(a)]).  In 1980, Congress passed the Solid Waste Disposal Act Amendments which amended § 7003 by substituting the words "may present" for the words "is presenting."  Maine People's Alliance, 471 F.3d at 287 (citing Pub. L. No 96-482, § 25, 94 Stat. 2334, 2348).

In a RCRA § 7003 case, the Court of Appeals for the Third Circuit held that "the use of the word 'may' in RCRA § 7003 was intended to make the provision 'expansive.'"  Maine People's Alliance, 471 F.3d at 287 (quoting United States v. Price, 688 F.2d 204, 213 [3d Cir. 1982]).  According to the court, "Congress, by enacting section 7003, intended to confer upon

courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic waste." <u>Price</u>, 688 F.2d 204, 214 (3d Cir. 1982).

Congress later passed the Hazardous and Solid Waste Amendments of 1984 (1984 amendments), Pub. L. No. 98-616, 98 Stat. 3221. The 1984 amendments "extended to citizens the right to sue a polluter who may be causing an imminent and substantial endangerment to public health or the environment." <u>Maine People's Alliance</u>, 471 F.3d at 287 (citing Hazardous and Solid Waste Amendments of 1984 § 401, 98 Stat. at 3268-69). The Senate Report that accompanied the 1984 amendments "approvingly cited and quoted <u>Price</u> on several occasions, specifically endorsing that court's conclusion that section 7003 is intended to give courts the tools to 'eliminate any risks posed by toxic waste.'" <u>Maine People's Alliance</u>, 471 F.3d at 287 (quoting S. Rep. No. 98-284, at 59 [1983]).

At about the same time, the Court of Appeals for the Fourth Circuit decided a RCRA § 7003 case, rejecting "the proposition that 'section 7003 was designed to control pollution only in emergency situations.'" <u>United States v. Waste Industries, Inc.</u>, 734 F.2d 159, 165 [4th Cir. 1984]). The court emphasized the statute's use of the word "may" and cited <u>Price</u> approvingly.

In attempting to interpret RCRA § 7002(a)(1)(B), courts look to <u>Price</u> and <u>Waste Industries</u> and the similar language found in RCRA § 7003. Although the court of appeals for this circuit has not had an opportunity to interpret the language of RCRA § 7002(a)(1)(B), other courts of appeals have, construing the provision expansively. <u>See Maine People's Alliance</u>, 471 F.3d at 288 (citing cases); <u>Burlington Northern & Santa Fe Ry. v. Grant</u>, 505 F.3d 1013, 1020 (10th Cir. 2007). "The courts emphasize the preeminence of the word 'may' in defining

the degree of risk needed to support RCRA § 7002(a)(1)(B)'s liability standard." Maine People's Alliance, 471 F.3d at 288.

The courts also agree that the word "substantial" implies serious harm. Id. (citing Parker v Scrap Metal Processors, Inc., 386 F.3d 993, 1015 [11th Cir. 2004]). Imminence generally has been read to require only that the harm is of a kind that poses a near-term threat. See Maine People's Alliance, 471 F.3d at 288; Meghrig, 516 U.S. at 485 ("An endangerment can only be 'imminent' if it 'threaten[s] to occur immediately,' Webster's New International Dictionary of English Language 1245 [2d ed. 1934]"). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" Meghrig, 516 U.S. at 486 (quoting Price v. United States Navy, 39 F.3d 1011, 1019 [1994]). There is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest itself immediately. See Maine People's Alliance, 471 F.3d at 288 (citing Cox v. City of Dallas, Tex., 256 F.3d 281, 299-300 [5th Cir. 2001]).

In this case, it is undisputed that sometime between April 20, 2006, and April 26, 2006, a gasoline spill occurred at the KJG Site and migrated to the Grace Site. Although some of the spill was captured by a sump below the gas dispenser island at the KJG Site, an unknown quantity of gasoline migrated to Grace's basement sump. On April 26, 2006, gasoline vapors entered Grace's basement sump and several employees and students became ill from the odors. The Milwaukee Fire Department (MFD) subsequently declared the Grace building uninhabitable, set up an emergency venting system, and ordered the electricity be shut off to avoid an explosion.

The plaintiff initiated an emergency response. The plaintiff's contractor pumped free product from the Grace building's footing drain tiles and excavated contaminated soil. The

contractor also installed a blower to address vapors from contamination that could not be removed. On May 1, 2006, the DHFS determined that the building was safe and the plaintiff was allowed to reoccupy and use its building.

Since May 1, 2006, the plaintiff has been using the basement of the building without interruption. Nevertheless, the plaintiff asserts that gasoline vapors are present in the Grace building endangering its occupants. The vapors, according to the plaintiff, may be at concentrations below the odor threshold, but are at concentrations that are harmful to children.

The DHFS conducted passive dosimeter sampling in the Grace building in November 2006. In a December 14, 2006, letter from the DHFS to Pastor Frank Susler, DHFS stated that it "did not find an indoor air problem of health concern" at the Grace building. (Preliminary Injunction Hearing, Exh. 100 at 1). Although benzene was detected in the church on the first floor at a level below the lab's ability to quantify, it was not detected in either the sump closet or the computer lab, both of which are located in the basement. Additionally, "the levels of [other] contaminants that were detected in the air via the sampling by the health department were extremely low or not detected." (Toumanen Testimony, Tr. at 377). Moreover, DHFS conducted the air sampling in the basement sump closet prior to the sealing of the sump. Thus, its sampling was "a good indicator of sort of a worst case situation. Where you have a sump open. Basically the water is exposed to the air. Anything that's a petroleum hydrocarbon would volatilize from that well, and into the air, and be collected. The fact that the results were low was certainly extremely encouraging." Id. at 379-380.

In 2006 and early 2007, Shaw Environmental & Infrastructure, Inc. [Shaw Environmental] sampled soil and groundwater beneath the concrete floor of the basement in the Grace building. The levels of petroleum constituents found in the samples were in excess

- 15 -

of WDNR standards.  In October of 2007, Shaw Environment collected sub-slab vapor samples at two locations in the basement of the Grace building.  Petroleum hydrocarbons were detected at both sampling locations.  HT-3, the sampling location near the western interior wall, had elevated levels of petroleum hydrocarbons and three of the compounds exceeded the United States Environmental Protection Agency (EPA) shallow soil screening level.  At the second location, one compound, benzene, was detected above the EPA screening level.  Mr. James Drought testified that "[b]oth of these results confirmed that there is [sic] vapors beneath the basement floor slab that represent a *potential* threat to the occupants of the building."  (Testimony of James Drought, Tr. at 85) (emphasis added).

Dr. Theodore Hogan testified that the periodic presence of gasoline odors "creates an imminent threat . . . a current threat" to the health of the children, teachers, and members of the church while they are present in the Grace basement.  (Testimony of Theodore Hogan, Tr. at 215).   No admissible evidence was presented that gasoline odors had been detected in the Grace building after April of 2006.  In interviews conducted in November 2007,  Dr. Hogan asked a number of students and teachers at Grace whether they had smelled gasoline odors after April of 2006.  Dr. Hogan stated that one student, Felix Plamas, had detected gasoline odors once after April of 2006, but the student could not recall specifically when that was.  Leah Susler, the principal at Grace reported to Dr. Hogan that she had smelled gasoline in the building five or six times.  She stated that they were faint odors and although she did not recall the specific dates, Dr. Hogan knew "for sure that some of them [had] occurred after October, 2006, in [his] conversations with her."  (Hogan Testimony, Tr. at 200).  Ms. Susler did not report that any students got sick from odors after April 2006.  None of the students or teachers testified at the preliminary hearing.  Pastor Susler testified that although he smelled

gasoline odors when he was outside the Grace building on occasion, he had not smelled gasoline odors inside the building after April of 2006.

Based on his interviews and his visit to the Grace building in November 2008, as well as Mr. Drought's testimony and report regarding the gasoline vapors under Grace's basement floor, Dr. Hogan concluded that there was a complete exposure pathway,[3] an unimpeded path between the source of the gasoline and the teachers and students. Dr. Hogan testified that the cement floor "provides a complete exposure pathway between the vapors under the floor and the school itself." (Hogan Testimony, Tr. at 206).

Dr. Hogan's conclusion, however, apparently is based, in part, on the statement by one student that on one occasion, date unknown, he smelled gasoline odors after April of 2006, and the statement of Leah Susler that she smelled gasoline odors five or six times, at least one of which was after October of 2006. Leah Susler did not testify and the record does not reflect how soon after October of 2006 she smelled the odors. Was it December of 2006, prior to the sealing of the sump (which was a complete exposure pathway) or October of 2007, after the sealing of the sump?[4]

Although there is evidence that gasoline vapors exist under the Grace building, there is no evidence that the compounds under the concrete slab of the building are migrating into the basement air. Mr. Toumanen conducted a chemical analysis of the data collected from under the slab and the air data taken in the building by the DHFS. He determined that the vapors under the slab do not match chemicals found in the basement air, are not migrating

---

[3]The plaintiff asserts in its brief that there are two exposure pathways – the un-remediated gasoline vapors under the basement floor and the utility trench located to the north of the Grace building. There is no testimony or evidence establishing that there is an exposure pathway from the trench to the Grace building.

[4]Although the court is unsure of the exact date the pump was sealed, it was sometime after the December 14, 2006, letter from the DHFS to Pastor Frank Susler.

into the Grace building, and have likely been stuck in the tight clay soils under the Grace building for some time. (Toumanen Testimony, Tr. at 395).

Mr. Toumanen testified that the chemical data collected by the sub-slab gas study done by the plaintiff's experts in October 2007, and the air sampling taken in the building by the DHFS indicated that the vapors under the building do not match those inside the Grace building. From the air sampling data, Mr. Toumanen concluded that qualitatively there was a distinctive mismatch between the sub-slab soil samples that were taken by Shaw Environmental versus what was found in the breathing air of the school building and the church. For example, Shaw Environmental detected n-hexane in high concentration under the slab, but it was not detected in the building air. Mr. Toumanen testified that if chemicals are migrating from underneath the building into the air in the building he would have expected to find some correlation, especially for materials that are highly volatile like n-hexane. (Toumanen Testimony, Tr, at 384).

Defendant KJG's experts, Robert Toumanen and Raymond Tierney, both testified that there is no imminent threat to the health of the children in the Grace building, and that the remedial actions to date have been appropriate. A complete exposure or intrusion pathway needs to be present for vapors in the soil under a building to migrate into the air inside the building. In April 2006, petroleum contamination on the KJG property migrated to the Grace Christian Fellowship Church foundation drain tiles and from there entered the sump system in the basement of the church. The contaminants evaporated from the water that was in the sump and went into the air. However, the complete exposure pathway which existed on April 26, 2006, is now broken and there is no evidence that any completed exposure pathway exists

between the vapors under the building (or the utility trench) and the breathable space inside the Grace building.

Mr. Toumanen testified that based upon his chemical comparison, a complete exposure pathway does not exist from under the building into the building. Mr. Toumanen testified that the levels of benzene in the air of the Grace building are comparable to background levels of benzene in Milwaukee air. Some of the compounds that were identified in the air by the DHFS are those also found in materials other than gasoline such as Windex, floor cleaners, polishes, varnish, paint, and nail polish.

Mr. Toumanen concluded from the chemical analysis of the sub-slab data that the vapors are likely aged contaminants that are contained or stuck underneath the building. He testified: "I think they've been under there a long time. And, you know, the – the Shaw report as I read it indicated that the material that they discovered beneath the slab – I don't recall any gravel. But the material that they did find under there was a brownish-grayish clay material. A clay is a very tight material. The granule sizes are minute, and it's very non-porous. It's almost like another concrete slab. And then you have a concrete slab." (Toumanen Testimony, Tr. at 398-99). Thus, "what you have here is a fairly well attenuated area where there are compounds that are found in petroleum distillates, and they're stuck there. They stay there. They're not going into the building, that's for sure." Id. He further testified that "if there is migration of the chemicals under the building, it is so insignificant as to not even be worth measuring. It would be highly, highly negligible." (Tuomanen Testimony, Tr. at 421, lines 8-11).

Raymond Tierney testified that from his perspective as a hydrogeologist of 22 years, the current investigation strategy has been appropriate stating: "I feel that Dr. Singh's

approach to the site has been adequate and appropriate for the contamination that's, that's been encountered out on the property." (Testimony of Raymond Tierney, April 9, 2008, Tr. at 63). Based on Mr. Tierney's experience and review of the testimony, taking into consideration the indoor air sampling completed by the Department of Health with the work that has been done to date to address the initial release, "the installation of the venting system, the sealing of the sump, the general operation of the HVAC system, the repair of the, the release line" he does not believe there is an imminent threat that requires additional emergency measures at the Grace Site. (Tierney Testimony, April 9, 2008, Tr. at 88-89).

Dr. Singh made over 75 visits to the Grace site to conduct remedial and monitoring activities. He was present when the emergency measures taken by the plaintiff's consultant, Shaw Environmental, oversaw the repair of the flex hose that was leaking, installed monitoring wells and borings, and removed free product from the site. Mr. Tierney testified that although there are a number of ways to approach an underground storage tank contamination, Dr. Singh's actions were consistent with what he would expect from an environmental consultant and also consistent with the Wisconsin codes.

In sum, based on the evidence presented, the plaintiff has not established that there is a complete exposure pathway from any gasoline vapors in the sub-slab under the Grace basement (or the utility trench) to the Grace building. The plaintiff has not shown that gasoline vapors are present in the Grace building creating "an imminent and substantial endangerment to health or environment." 42 U.S.C. § 6972(a)(1)(B). Accordingly, the plaintiff has failed to establish that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to a final resolution of its claims. See Girl Scouts of Manitou Council, Inc., 549 F.3d at 1086. Therefore, the plaintiff's motion for a preliminary injunction will be denied.

## MOTION TO FILE AN AMENDED COMPLAINT

The plaintiff has renewed its request to file an amended complaint, including adding an additional defendant, PSK Investments, LLC, the current owner of the gas station which was previously owned by defendant KJG. Defendant KJG initially opposed the motion which was made in January 2008, during the course of the continued preliminary injunction hearing, asserting that the plaintiff failed to file the motion in a timely fashion, thereby prejudicing the defendant.[5]

Rule 15(a) of the Federal Rules of Civil Procedure states that leave to file an amended complaint "shall be freely given when justice so requires." The Supreme Court has explained the meaning of "freely given" as used in Rule 15(a) by stating:

> In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of a movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. - the leave sought should, as the rules require be freely given.

Foman v. Davis, 371 U.S. 178, 182 (1962). Rule 15(a) "evinces a bias in favor of granting leave to amend" and unless there is a substantial reason to deny leave to amend, "the discretion of the district court is not broad enough to permit denial." Select Creations, Inc. v. Paliafito America, Inc., 830 F. Supp. 1213, 1216 (E.D. Wis. 1993). If a motion to file an amended complaint is granted, the amended complaint supersedes the prior complaint. See Duda v. Board of Ed. of Franklin Park Public School District No. 84, 133 F.3d 1054, 1056 (7th Cir. 1998).

---

[5]In opposing the plaintiff's motion for a preliminary injunction, defendant KJG stated that the plaintiff had not joined a necessary party, PSK Investments, Inc., the current owner of the gas station.

In this case, there is no indication that the plaintiff has unduly delayed the filing of its motion to amend nor will defendant KJG suffer undue prejudice because the plaintiff is allowed to amend the complaint. Accordingly, the plaintiff's motion to amend its complaint will be granted. The plaintiff must file its amended complaint by **August 21, 2009.** The telephone conference scheduled for August 20, 2009, at 2:30 p.m. will be rescheduled at a later date.

### CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** that the plaintiff's motion for preliminary injunction be and hereby is **denied.** (Docket #30).

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file a proposed amended complaint be and hereby is **granted**. (Docket #138-2).

**IT IS ALSO ORDERED** that the plaintiff's amended complaint shall be filed by **August 21, 2009**.

**IT IS FURTHER ORDERED** that the telephone conference scheduled for August 20, 2009, at 2:30 p.m. be and hereby is **cancelled**. The conference will be rescheduled in the future.

Dated at Milwaukee, Wisconsin this 7th day of August, 2009.

BY THE COURT:

s/ Patricia J. Gorence

PATRICIA J. GORENCE
United States Magistrate Judge