**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

GRACE CHRISTIAN FELLOWSHIP,

     Plaintiff,

     v.                        Case No. 07-C-0348

KJG INVESTMENTS INC. and
COLONY INSURANCE COMPANY
and PSK INVESTMENTS, LLC,
     Defendants.

# DECISION AND ORDER

On April 13, 2007, plaintiff Grace Christian Fellowship (Grace) filed this action against KJG Investments, Inc. (KJG) and Colony Insurance Co. (Colony) under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972. The plaintiff also asserted state law claims of continuing trespass, nuisance, and negligence. On August 7, 2009, the plaintiff filed an amended complaint adding defendant PSK Investments, LLC (PSK).

Pursuant to the amended scheduling order issued in this case, the parties filed the following motions: plaintiff's motion for summary judgment on the liability of defendants for trespass, nuisance and negligence and partial determination of liability under RCRA (Docket #224), plaintiff's motion for summary judgment as to defendant Colony Insurance (Docket #229), and defendants KJG and PSK's motion for summary judgment. (Docket #251).[1] The plaintiff also filed a motion to reconsider the court's August 4, 2011, Decision and Order

---

[1] The court has previously issued an order on the plaintiff's motion for summary judgment as to defendant Colony.

denying in part and granting in part defendants KJG and PSK's motion to strike. (Docket #287). The parties' pending motions will be addressed separately herein.

<u>**Plaintiff's Motion for Reconsideration of the Court's Decision and Order of August 4, 2011**</u>

The plaintiff filed a motion for the court to reconsider its Decision and Order of August 4, 2011, denying its motion seeking to have the court consider environmental test results and evidence of the current environmental condition affecting the Grace building. In that decision and order, the court struck evidence or observations from after December 15, 2009. The plaintiff maintains that the specific injunctive relief sought will need to be tailored at trial to the environmental facts existing at the time of trial. Thus, the plaintiff asserts that the current environmental status of the properties will need to be considered at trial in order to fashion an appropriate injunction. The plaintiff submitted two August 29, 2011, letters from John Hnat, Project Manager/Hydrogeologist for the Wisconsin Department of Natural Resources (WDNR) which address the ongoing WDNR investigation of the properties at issue.

In response, defendants KJG and PSK assert that the plaintiff presented no evidence in its motion to reconsider that was not previously considered either directly or indirectly by the court. Defendants KJG and PSK further assert that ongoing discovery as proposed by the plaintiff would be prejudicial to the defendants. According to defendants KJG and PSK, the consideration of this additional testing data would open the door for the plaintiff to attempt to provide more expert opinions. It also would require additional expert depositions in order to identify the effect the new information would have on the various expert opinions already provided in this case.

In its November 16, 2010, motion to amend the scheduling order, the plaintiff sought an order amending the scheduling order "in order to accommodate the needs of the parties to

continue to exchange groundwater/soil and air data which is periodically obtained by both parties and filed with the Department of Natural Resources (DNR)." (Plaintiff's Civil Local Rule 7(h) Expedited Nondispositive Motion to Amend the Scheduling Order [Motion to Amend] at 1). The plaintiff requested that the current discovery deadline be extended "as it relates to the issue of investigative environmental data obtained by either party to this case after [the] December 15, 2009 cut off date and forty-five (45) days prior to trial." (Motion to Amend at 2).

In its August 4, 2011, Decision and Order, the court denied the plaintiff's motion, concluding that the plaintiff failed to show good cause to amend the scheduling order and reopen discovery. The court also held that "any averment that relates to evidence or observations from after December 15, 2009, will be stricken and not considered by the court in deciding the pending motions." (August 4, 2001, Decision and Order at 8). The court also indicated that it would not consider any data from after December 15, 2009. The defendants' submissions were subjected to this restriction as well.

The plaintiff's motion for reconsideration seeks the usage at trial of facts occurring after December 15, 2009, in order for the court to fashion appropriate injunctive relief and, as the plaintiff argued in its motion to amend the scheduling order, in deciding the pending motions for summary judgment. The court's August 4, 2011, Decision and Order limited its decision to the pending motions for summary judgment. The plaintiff has not proffered any compelling argument nor submitted any new evidence which calls into question the court's decision striking averments relating to evidence or observations and data obtained after the discovery deadline, December 15, 2009. Such evidence, however, may be relevant in the future to determine the appropriate injunctive relief in this case. Accordingly, the plaintiff's motion for reconsideration will be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the court must consider the evidence and all reasonable inferences in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986), Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 849 [7th Cir.

1992]).  Any proposed findings of fact which do not set forth facts that "would be admissible in evidence" have not been included in the relevant facts.  Fed. R. Civ. P. 56(e)(1).

An affidavit submitted to support or to oppose a summary judgment motion "must be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact."  Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 [7th Cir. 1998]).  A finding of fact based on an affidavit which contains conclusory legal statements and is barren of any relevant facts of which the affiant has personal knowledge is not proper under Rule 56(e).  See Resolution Trust Corp. v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992).  Such unsupported conclusory allegations have not been included in the relevant undisputed facts.

To the extent that an objection to a proposed finding of fact fails to cite specific evidentiary support, the objection has no weight.  See Schneiker v. Fortis Ins. Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Doe v. Cunningham, 30 F.3d 879, 881 (7th Cir. 1994).  Moreover, to the extent that an objection is non-responsive to the proposed finding of fact, the objection does not create a dispute of fact.

<u>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>
<u>**RELEVANT UNDISPUTED FACTS**</u>[2]

Defendant KJG Investments, Inc. (KJG) purchased the gas station located at 9922 West Capitol Drive, Milwaukee, Wisconsin, in 1996 (gas station). On April 25, 2006, the land on which the gas station is located was transferred to defendant PSK Investments, LLC. (PSK). Defendants KJG and PSK were the gas station owners at the relevant times. Jagdisher Singh Kler is the former vice president and 50% stock holder of KJG and the controlling member of PSK.

The plaintiff, Grace Christian Fellowship (Grace), owns the property adjacent to the gas station on the east located at 9900 West Capitol Drive, Milwaukee, Wisconsin. It purchased the property in 2001.

The underground storage tanks and lines at the gas station were inspected by the State of Wisconsin Department of Commerce (Department of Commerce) on April 20, 2006. The gas station tanks and lines passed the test conducted by the Department of Commerce (i.e., no violations were noted). The Department of Commerce found no leaks in the flex hose connector under pump island 5 and 6 on April 20, 2006.

On April 26, 2006, personnel from Grace reported gasoline odors in the basement of the Grace Christian Fellowship building (Grace building). The Milwaukee Health Department, Wisconsin Department of Natural Resources (WDNR), and Milwaukee Fire Department responded to the reported gasoline odors. That evening, the gas station owner contacted its environmental consultant, OM Enterprises.

---

[2]As a general matter, unless accompanied by citation, the relevant facts are taken from the stipulated facts and the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

The Milwaukee Fire Department evacuated the Grace building on April 27, 2006. Subsequently, the gasoline odors in the basement of the building were determined to be emanating from a sump in the northwest corner of the basement. Scott Ferguson of the WDNR was on site on April 27, 2006, to monitor the emergency response action.

The gas station owner retained Uni-Pump which found a leak in a flex hose connector under pumps 5 and 6, which are located on the eastern side of the gas station property. The leak occurred sometime between April 20 and 26, 2006.

The gasoline containment system at the gas station is located underground. The flex hose connector is visible only after removing a cover that is affixed into the ground with screws. The flex hose is contained entirely within a sump under the dispenser island such that any leaking gasoline flows into the sump and should not escape the system. The gasoline collected in the sump under the dispenser island eventually flows through the containment piping back to the submerged turban pump (STP) sump by the force of gravity.

Seventy gallons of gasoline were found contained inside the sump under the dispenser island. One hundred and seventy gallons of gasoline were contained in the STP pump and pumped back into the storage tank by Uni-Pump during its investigation of the leak. Uni-Pump also found that the float sensor in the sump at the premium STP pit and the regular unleaded STP pit were not functioning on April 27, 2006.

KJG utilized a company called Protonic, as well as the Department of Commerce, to test and inspect their gasoline containment and disbursal system for leaks and identify any other potential problems. Mr. Singh Kler testified that he checked the flex connector sometime during the week prior to the discovery of the leak, but found no evidence of a leak. KJG utilizes an automatic tank gauge system which is an acceptable method of leak detection under

the Wisconsin Administrative Code. KJG performed an inventory verification pursuant to the administrative code. KJG had no actual knowledge that a leak had occurred prior to the plaintiff reporting odors on April 26, 2006.

Uni-Pump replaced the leaking flex hose connector on April 27, 2006. On that same date, Dr. Raghu Singh of OM Enterprises collected a water sample from the basement sump of the Grace building and observed the presence of free product in the sump water.

Also on April 27, 2006, the plaintiff hired North Shore Environmental Consultants (North Shore Environmental) to conduct the emergency response to the gasoline odor incident. It set up an emergency, explosion-proof venting system outside of the Grace building to vent gasoline vapors out of the building.

The following day, North Shore Environmental excavated approximately 143 tons of contaminated soil along the west wall of the Grace building. The excavation was advanced to expose the drain tiles along the building's foundation. North Shore Environmental opened the drain tiles and installed an explosion-proof blower (drain tile venting system) to remove petroleum fumes and vent the fumes through a PVC pipe to the roof of the building. North Shore Environmental also installed a sump well in the excavated area for the purpose of bailing free product and testing groundwater. North Shore Environmental vacuumed out the sump crock in the Grace building and cleaned the sump crock with BioSolve fuel emulsifier.

The Milwaukee Health Department inspected the Grace building on May 1, 2006, and allowed Grace to reoccupy the building on that date. The sump in the basement of the Grace building from which the gasoline odors emanated on April 26, 2006, has since been sealed. The tank and lines at the gas station were tested on May 5, 2006, by Protanic and no leaks were found.

The WDNR opened a file for this site pursuant to Wisconsin statutes and administrative regulations and assigned John Hnat as the project manager to oversee the investigation and remediation of the site. The WDNR issued a responsible party letter to the gas station owner dated May 4, 2006. The letter was addressed to Jagdisher Singh Kler as a representative of the gas station owner.

Dr. Singh of OM Enterprises, submitted a work plan for site investigation to the WDNR dated June 5, 2006. Subsequently, on July 27, 2006, OM Enterprises advanced three soil borings on the Grace property. One of the soil borings was converted to a monitoring well known as MW-6. On July 28, 2006, OM Enterprises installed two monitoring wells, MW-1 and MW-2, on the gas station property. OM Enterprises then drilled four borings on the gas station property on July 31, 2006. Three of the borings were converted to monitoring wells known as MW-3, MW-4, and MW-5. Between February 15 and 17, 2010, OM Enterprises oversaw the advancement of 11 soil borings in the alley to the north of the gas station and Grace properties. Four of the 11 borings were converted into ground water monitoring wells known as MW-7, MW-8, MW-9, and MW-10.

The pathway of the April 2006 spill moved northwesterly through the product lines between pumps 5 and 6 and the underground storage tanks. The pathway then entered the alley to the north of the gas station property and transversed east through the utility lines toward the Grace property. OM Enterprises conducted daily removal of product and contaminated water from the excavation sump along the west wall of the Grace building beginning on April 30, 2006, and continuing through June 1, 2006. Weekly removal took place from June 3, 2006, through December 30, 2006. Monthly removal of product and water took place from January 27, 2007, and continued for a period of time. OM Enterprises arranged for

Chief Liquid Waste to pump 6,000 gallons of petroleum-contaminated water from MW-2 on August 16, 2006. OM Enterprises continues its investigation of the April 2006 incident at the gas station and Grace properties with oversight from the WDNR. OM Enterprises continues to collect water samples from the monitoring wells and basement sump.

Donna Howe from the City of Milwaukee Health Department and Chuck Warzecha from the State of Wisconsin Department of Health and Family Services (DHFS) collected air samples from the Grace building in November 2006. The WDNR retained Veolia to collect two indoor air samples at the Grace building using Summa canisters over a 24-hour period on June 5, 2008. In August 2008, the WDNR installed a sub-slab vapor extraction system at the Grace building.

Colony Insurance paid approximately $42,000 for the emergency work conducted by North Shore Environmental. Defendants KJG and PSK has not yet completed their investigation of the gas station or Grace properties.

In October 1983, the previous owner of the Grace building, a Factory Carpet Outlet store, discovered gasoline in the basement sump. Mobile Oil Corporation owned the gas station at the time. It contacted Warzyn to initiate a site investigation. When KJG Investments purchased the property in 1996, it retained K. Singh & Associates to complete the site investigation and remedial action associated with the 1983 spill. Dr. Raghu Singh was an environmental consultant working at K. Singh & Associates at the time and participated in the investigation and remediation of the site from 1996 to 2000. K. Singh & Associates determined that the gasoline in 1983 migrated from the gas station property to what is now the Grace building through the alley/utility corridor to the north of the properties.

## ANALYSIS

The plaintiff filed a motion for summary judgment on its claims of trespass, nuisance, and negligence. The plaintiff maintains that the 2006 release of contamination at the KJG gas station traveled through the environment to Grace, constituting a trespass. The plaintiff asserts that defendants KJG and PSK were negligent in failing to prevent the leak/spill/release which occurred at the gas station in April 2006 and negligent in failing to repair the alarm system which would have notified KJG of the leak. The plaintiff further asserts that defendants KJG and PSK knew or should have known that gasoline leaks or spills from the gas station's underground storage tank and dispensing system would likely pollute the Grace building or property belonging to third parties.

The plaintiff also asserts that defendants KJG and PSK created a private nuisance when they permitted their gasoline to enter the plaintiff's land. The plaintiff further asserts that the defendants' failure to abate the nuisance is either intentional or negligent and, in either case, KJG and PSK have breached their duty to keep contamination from leaving their land and entering the plaintiff's building.

Finally, the plaintiff seeks a partial determination of liability under the Resource Conservation Recovery Act (RCRA), 42 U.S.C. § 6972. The plaintiff asserts that it is uncontested that defendants KJG and PSK have (1) generated solid or hazardous waste and (2) contributed or are contributing to the past or present handling, storage, treatment, transportation or disposal of solid or hazardous waste. Thus, the plaintiff seeks summary

judgment as to those two elements under RCRA.[3]  The court will address this issue when addressing the defendants' motion for summary judgment.

In response, defendants KJG and PSK assert that there is no evidence from which a reasonable trier of fact could find that KJG was negligent.  The defendants maintain that there is no evidence of any specific action on behalf of KJG that caused the escape of gasoline from its underground containment system.  Specifically, the defendants contend that there is no evidence as to how the leak in the flex hose connector occurred, no evidence as to who caused the leak in the flex hose connector and there is no evidence as to when the leak in the flex hose connector occurred between April 20, 2006, and April 26, 2006.  The defendants further assert that there is no evidence as to how or why the float sensor failed, who caused the float sensor to fail, and who was responsible for testing and maintaining the sensors.  The defendants further maintain that there is no evidence as to when the float sensors failed.

Defendants KJG and PSK also maintain that the doctrine of res ipsa loquitar does not apply in this case.  According to the defendants, in order for res ipsa loquitar to apply, the following two conditions must be established: (1) there must be evidence that the event in question is of a kind which does not ordinarily occur in the absence of negligence; and (2) there must be evidence that the agency or instrumentality causing the harm was within the "exclusive control" of the defendant.  The defendants cite McGuire v. Stein's Gift & Garden Center, Inc., 178 Wis.2d 379, 504 N.W.2d 385 (Wis. Ct. App. 1993) to support their position.

The defendants contend that the plaintiff has no evidence that the alleged leakage of gasoline from KJG's underground containment system is something that does not ordinarily

---

[3] While unusual, the plaintiff's motion for summary judgment as to two elements under RCRA is allowed by Fed. R. Civ. P. 56(a).

occur in the absence of negligence.  In other words, the defendants assert that there is no evidence that KJG could have prevented the leak in the flex hose or the failure of the float sensor by exercising reasonable care under the circumstances.  The defendants also contend that the plaintiff has not submitted any evidence that the gasoline containment system was within the "exclusive" control of KJG.

Defendants KJG and PSK maintain that even if <u>res ipsa loquitor</u> applies, the trier of fact is required to decide the issue of whether KJG breached the standard of care.  Thus, the defendants assert that even if the plaintiff is entitled to a <u>res ipsa loquitur</u> instruction, the instruction would merely provide a permissive inference that the jury is free to reject or accept.

With respect to the plaintiff's trespass and nuisance claims, defendants KJG and PSK assert that there is an issue of fact as to whether KJG was negligent, i.e., whether its conduct met the standard of care under the circumstances.  Finally, the defendants assert that there is an issue of fact that precludes granting summary judgment on the first two elements of the plaintiff's RCRA claim.  Specifically, the defendants state that "while there is no issue of fact that there was a leak in KJG's flex hose connector, there is an issue of fact as to how much, if any, gasoline escaped KJG's secondary gasoline containment system into the environment such that it would constitute 'discarded material.'"  (Defendants KJG Investments, Inc. and PSK Investments, LLC's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment [Defendants' Memorandum in Opposition at 25).

**Negligence**

The elements of a cause of action for negligence are (1) a duty of care on the part of the defendants, (2) a breach of that duty, (3) a causal connection between the conduct and the injury, and (4) an actual loss or damage as a result of the injury. Transportation Ins. Co., Inc. v. Hunzinger Constr. Co., 179 Wis. 2d 281, 293, 507 N.W.2d 136 (Wis. Ct. App. 1993). Duty is a question of law, and in Wisconsin, "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." Behrendt v. Gulf Underwriters Ins. Co., 318 Wis. 2d 622; 768 N.W.2d 568, 574 (Wis. 2009). "A person is negligent if the person, without intending to cause harm, either acts affirmatively or fails to act in a way that a reasonable person would recognize as creating an unreasonable risk of injury." Megal v. Green Bay Area Visitor & Convention Bureau, Inc., 274 Wis. 2d 162; 682 N.W.2d 857, 866 (Wis. 2004) (citing Rockweit v. Senecal, 197 Wis. 2d 409, 424, 541 N.W.2d 742 [Wis. 1995]).

The plaintiff states that the court can find that the defendants were negligent per se:

> Defendants KJG and PSK have duty of care under Wisconsin law, particularly Wis. Stats. 292.11, to prevent a release of hazardous substances from its site from reaching property owned, operated or utilized by another party. Defendants had a duty to protect those who foreseeably could be harmed by a spill.

(Plaintiff's Reply to the Response of Defendants KJG and PSK on Plaintiff's Motion for Partial Summary Judgment [Plaintiff's Reply] at 9 [citing Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment on Issues of Liability of the Defendants for Trespass, Nuisance and Negligence and a Partial Determination of Liability under RCRA [Plaintiff's Memorandum of Law] at 5]).

The plaintiff's assertion "that the failure to prevent the passage of the spill from its land to Grace's sump and under Grace's building is negligence per se" is not supported by Wisconsin case law. (Plaintiff's Reply at 4). In Grube v. Daun, the Wisconsin Supreme Court held that Wis. Stat. § 292.11[4] is not a safety statute, the violation of which would be negligence per se. 210 Wis. 2d 681, 563 N.W.2d 523, 528 (Wis. 1997).

An additional basis of negligence[5], according to the plaintiff, is defendants KJG and PSK's failure to maintain the dispensing equipment and the sump spill sensor devices. Without analysis or explanation, the plaintiff cites to Wis. Admin. Code § COMM 10.510(1)(c).[6] It is unclear from the plaintiff's submissions whether it is asserting that Wis. Admin. Code § COMM 10.510(1)(c) creates a duty, the breach of which is negligence per se or whether the defendants' violation of Wis. Admin. Code § COMM 10.510(1)(c) is relevant to the determination of whether defendant KJG and PSK were negligent.[7]

Accordingly, the court cannot find that defendants PSK and KJG were negligent per se. The court also cannot find that defendants PSK and KJG were negligent as a matter of law. The plaintiff proffered no argument addressing the elements of a common law negligence claim. Thus, the plaintiff's motion for summary judgment as to its negligence claim must be denied.

---

[4] At the time of the court's decision, Wis. Stat. § 292.11 was numbered Wis. Stat. § 144.76.

[5] The plaintiff indicates in its reply brief that defendants KJG and PSK's violation of Wis. Stats. 292.11 is the primary basis for their negligence.

[6] As of January 1, 2012, this is Wisconsin Administrative Code SPS 310.510(1)(c).

[7] The court need not address the parties' discussion of the doctrine of res ipsa loquitur. The doctrine of res ipsa loquitur is an evidentiary rule that ordinarily arises at trial when determining the instructions the trial court should give to the jury. Milwaukee Metro. Sewerage Dist. V. City of Milwaukee, 267 Wis. 2d 688, 704, 671 N.W.2d 346,354 (Wis. Ct. App. 2003).

Additionally, the Wisconsin courts have recognized that generally "negligence is a question for the fact-finder" <u>Casper v. Am. Int'l S. Ins. Co.</u>, 2011 Wis. LEXIS 367, 800 N.W.2d 880, 899 (Wis. 2011), and "is almost always inappropriate for summary judgment." <u>Brown v. Sandeen Agency, Inc.</u>, 316 Wis. 2d 253, 762 N.W.2d 850, 856 (Wis. Ct. App. 2008). Thus, for the reasons set forth herein, the court also declines to enter summary judgment in favor of defendants KJG and PSK as they had requested in their brief filed in opposition to the plaintiff's motion and sought in their motion for summary judgment.

**<u>Nuisance</u>**

Two types of nuisance are recognized under Wisconsin law -- public nuisance and private nuisance. <u>Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.</u>, 254 Wis. 2d 77, 102, 646 N.W.2d 777, 778 n.14 (Wis. 2002). "Public nuisance is a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community." <u>Id.</u> at 788. The number of people injured does not define a public nuisance. <u>State v. Quality Egg Farm, Inc.</u>, 104 Wis.2d 506, 517, 311 N.W.2d 650, 656 (Wis. 1981). Rather, the character of the injury and the right impinged upon is the proper test. <u>Id.</u>

"A private nuisance is 'a nontrespassory invasion of another's interest in the private use and enjoyment of land.'" <u>Prah v. Maretti</u>, 108 Wis. 2d 223, 231, 321 N.W.2d 182, 187 (Wis. 1982) (quoting Restatement [Second] of Torts sec. 821[d] [1979]). Wisconsin has adopted the analysis for private nuisance set forth in Restatement (Second) of Torts, § 822 (1977). <u>See Prah v. Maretti</u>, 321 N.W.2d at 187 (Wis. 1982). Section 822 of the Restatement (Second) of Torts, provides:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either

(a) intentional and unreasonable, or
(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Once it is established that a nuisance exists, the next step is to determine whether there is any liability-forming conduct. Milwaukee Metro. Sewerage Dist. v. City of Milwaukee, 277 Wis. 2d 635, 660 N.W.2d 658, 671 (Wis. 2005). "Liability for a nuisance may be based upon either intentional or negligent conduct." Id.

The Wisconsin courts have "recognized that the concepts of negligence and nuisance overlap when a nuisance is predicated on negligent conduct, but nonetheless [have ] stressed that the two concepts are distinct." Id. Nuisance is a result whereas negligence is a cause. Id.; Physicians Plus, 646 N.W.2d at 793.

"An essential element of a private nuisance claim grounded in negligence is proof that the underlying conduct is 'otherwise actionable under the rules controlling liability for negligent . . . conduct." Milwaukee Metro. Sewerage Dist, 660 N.W.2d at 674 (quoting Restatement [Second] of Torts § 822). As a result, "when a nuisance is grounded solely on negligent acts, there is no need to separately analyze a cause of action for negligence and nuisance because the negligence is but the tortuous conduct upon which liability for the result -- the nuisance -- depends." Milwaukee Metro. Sewerage Dist, 660 N.W.2d at 674.[8] Moreover, "[s]ince proof of negligence is essential to a negligence-based nuisance claim, . . . the usual defenses in a negligence action are applicable." Id.

"When liability for a nuisance is predicated upon a failure to act (failure to abate nuisance), notice of the defective condition is a prerequisite to liability." Id. at 675.

---

[8] In this case, the nuisance is grounded solely on a negligent act.

> In order to maintain a cause of action for private nuisance, there must be proof that there exists an invasion or interference with the private use and enjoyment of land, the defendant's conduct was the legal cause of the invasion, and the defendant's conduct is actionable under the rules relating to intentional or negligent conduct. When liability for a nuisance is predicated upon negligent conduct, it is necessary to establish both the existence of a private nuisance--an interference with the private use and enjoyment of land--and that the conduct causing the harm is actionable under the rules governing liability for negligent conduct, including notice.

Id. at 675-76.

As previously stated, the plaintiff has failed to establish that the defendants were either per se negligent or negligent as a matter of law. Without a finding that defendants KJG and PSK were negligent, the plaintiff's motion for summary judgment as to its nuisance claim must be denied.

**Trespass**

In Fortier v. Flambeau Plastics Co., the court explained that a trespass "may be either an intentional intrusion or an unintentional intrusion resulting from reckless or negligent conduct . . .." 164 Wis. 2d 639, 476 N.W.2d 593, 608 (Wis. Ct. App. 1991); see also Scottish Guarantee Ins. Co. v. Dwyer, 19 F.3d 307, 311 (7th Cir. Wis. 1994). With respect to unintentional intrusions, the court adopted Restatement (Second) of Torts § 165 (1965), which provides:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, [or] to a thing or a third person in whose security the possessor has a legally protected interest.

Fortier, 476 N.W.2d at 608.  The court previously stated that it could not find defendants PSK and KJG negligent per se or negligent as a matter of law.  Without such a finding, the plaintiff's motion for summary judgment as to its trespass claim must be denied.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### RELEVANT UNDISPUTED FACTS[9]

On February 15, 1984, the Wisconsin Department of Natural Resources (WDNR) was notified of the petroleum contamination at the gas station located at 9922 West Capitol Drive (gas station) and the adjacent property.  On February 28, 1984, Warzyn, Inc., sent a letter to Mobil Oil Company regarding discovery of a gasoline release from the buried tanks on the property. Warzyn, Inc., also concluded that petroleum was directed along a path of utility trenches on the north property line, migrating to what is now the Grace property.  As late as 1992 (nine years after the 1983 spill), the measured levels of benzene were as high as 18,000 ppb[10] near the northwest corner of the Grace property (MW-1).  On October 13, 1995, results from MW-1 were 9,500 ppb benzene.

In December of 1996, defendant KJG purchased the gas station, knowing that the property was already contaminated.  Defendant KJG retained Dr. Raghu Singh through K. Singh & Associates as an environmental consultant to work with the WDNR to cleanup the contamination with funding from the Petroleum Environmental Cleanup Fund Act.

When closing the site in 2000, the WDNR and the Wisconsin Department of Commerce [Department of Commerce] set a cleanup goal for 1000 ppb benzene in soils and granted an exemption for levels of benzene in groundwater.  The request to close the site was approved

---

[9] As a general matter, unless accompanied by citation, the relevant facts are taken from the stipulated facts and the parties' proposed findings of fact which are not disputed.  Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

by the Department of Commerce and accepted by the WDNR on January 10, 2000. In the letter closing the site, the WDNR concurred that no further action was necessary. Pursuant to administrative regulations, in order to close the site, the WDNR needed to find that it no longer posed a threat to public health, safety or welfare. The WDNR closed the site in 2000, knowing that contamination remained on the gas station property, in the utility trench and on the neighboring property later purchased by the plaintiff. At the time of the site closing, it concluded that the contamination that remained was at an acceptable level and did not pose a threat to public health, safety or welfare. The WDNR did not specifically acknowledge that there was contamination under the building currently occupied by Grace.

After the April 2006 incident at the KJG gas station, an investigation of the sump pump located in the basement of the Grace building revealed that it contained gasoline. The gasoline vapors coming from the basement sump caused the Grace building to be evacuated on April 26, 2006. The 2006 spill necessitated emergency contaminated soil excavation work and installation of a blower to remove the 2006 vapors from under the footings of the Grace building.

On April 28, 2006, North Shore Environmental Consultants (North Shore Environmental) excavated 143 tons of contaminated soil along the west wall of the Grace property. The excavation was advanced to expose the drain tiles along the building foundation. North Shore Environmental opened the drain tiles and installed an explosion-proof blower (drain tile venting system) to remove petroleum fumes and vent the fumes through a PVC pipe to the roof of the building. North Shore Environmental also installed a sump well in the excavated area for the purpose of bailing free product and testing groundwater. On April 28, 2006, North Shore

---

10 PPB means parts per billion.

Environmental vacuumed out the sump crock in the Grace building and cleaned the sump pump crock with BioSolve fuel emulsifier.

On April 30, 2006, Dr. Raghu Singh on behalf of KJG began daily removal of free product from the excavation sump located on the plaintiff's property. The onsite investigation of the 2006 incident continues.

On May 1, 2006, the Milwaukee Health Department inspected the Grace building and allowed the plaintiff to reoccupy the building on that date. The sump in the basement of the Grace building from which the gasoline odors emanated on April 26, 2006, has been sealed.

Pursuant to Wisconsin statutes and administrative regulations, the WDNR opened a file for this site. John Hnat was assigned as the project manager to oversee the investigation and remediation of the site. On May 4, 2006, the WDNR issued a responsible party letter to the gas station owner. The letter was addressed to Jagdisher Singh Kler as a representative of the gas station owner. Dr. Singh of OM Enterprises, on behalf of the gas station owner, submitted a work plan for site investigation to the WDNR dated June 5, 2006.

The pathway of the April 2006 spill moved in a northwesterly direction through the product lines between pumps 5 and 6 and the underground storage tanks. The pathway then entered the alley located to the north of the gas station property and transversed east through the utility lines toward the Grace property.

On July 27, 2006, OM Enterprises advanced three soil borings on the Grace property. One of the soil borings was converted to a monitoring well known as MW-6. On July 28, 2006, OM Enterprises installed two monitoring wells, MW-1 and MW-2, on the gas station property. OM Enterprises then drilled four borings on the gas station property on July 31, 2006. Three of the borings were converted to monitoring wells known as MW-3, MW-4, and MW-5. Between

February 15 and 17, 2010, OM Enterprises oversaw the advancement of 11 soil borings in the alley to the north of the gas station and Grace properties. Four of the 11 borings were converted into ground water monitoring wells known as MW-7, MW-8, MW-9, and MW-10.

Beginning on April 30, 2006, and continuing through June 1, 2006, OM Enterprises conducted daily removal of product and contaminated water from the excavation sump along the west wall of the Grace building. Weekly removal of product and water took place from January 27, 2007, and continued for a period of time. OM Enterprises arranged for Chief Liquid Waste to pump 6,000 gallons of petroleum-contaminated water from MW-2 on August 16, 2006. OM Enterprises continues its investigation of the April 2006 incident at the gas station and Grace Christian Fellowship properties with oversight from the WDNR. OM Enterprises continues to collect water samples from the monitoring wells and basement sump.

In November of 2006, Donna Howe from the Milwaukee Health Department and Chuck Warzecha from the Wisconsin Department of Health and Family Services (DHFS) collected air samples from the Grace building. The air testing performed by the DHFS in November of 2006 did not "find an indoor air quality problem of health concern." (Stipulated Facts, Exh. 2).

The WDNR retained Veolia to collect two indoor air samples at the Grace building using Summa canisters over a 24-hour period on June 5, 2008. This data showed the presence of benzene, ethyl benzene and 1,2,4 trimethyl benzene in excess of EPA indoor vapor screening levels.

Subsequent to the testing, in August of 2008, the WDNR installed an enhanced sub-slab vapor extraction system at the Grace building to mitigate any long-term potential for sub-slab gasoline vapor intrusion at the building. Petroleum hydrocarbons remain under the Grace building. During the installation of the sub-slab vapor extraction system in August 2008, Shaw

Environmental and Infrastructure, Inc. (Shaw Environmental) collected soils and groundwater samples from below the basement floor. Significant levels of hydrocarbons in excess of WDNR standards were detected in soil beneath the basement floor of the Grace building. The highest concentrations (1,640 ppb) were detected near the southwest column.

The temporary blower outside the west wall of the Grace building and the sub-slab vapor extraction system installed under the Grace floor by the WDNR in August 2008 are mitigation systems not remediation systems. These systems do not remove all the residual gasoline from under the Grace building.

The excavation sump is located directly outside the Grace building in the area that North Shore Environmental excavated following the April, 2006 incident. Nineteen rounds of groundwater sampling were conducted by OM Enterprises between April 2006 and November 2009, at the excavation sump. Benzene was detected at 5700 ppb on April 29, 2006. The concentration decreased to 107 ppb by November 2009. Levels were also measured at less than 0.22 ppb in December 2007 and 157 ppb in March 2007.

The Enforcement Standard is a standard to which a response from a responsible party will be required by the WDNR. The Preventative Action Limit (PAL) is an early warning standard that signifies a potential of contamination in the sub-surface and indicates that additional investigation likely will be necessary to evaluate if an exceedance of an Enforcement Standard is present on the property. The Enforcement Standard and PAL were created to regulate groundwater that is intended for drinking. Additionally, they set numerical groundwater standards that provide the criteria for the protection of the public's health and welfare. The numerical standards apply to the shallow groundwater aquifer, as well as the deep groundwater aquifer which generally can be used for human consumption. The plaintiff

does not drink the groundwater at this site.  The WDNR can (and often does) set a cleanup goal for a particular property with respect to groundwater above the state's PAL of 0.5 parts per billion and Enforcement Standard of 5.5 parts per billion for benzene .

MW-1 is a monitoring well located immediately west of the Grace building just north of the area that was excavated by North Shore Environmental following the April 2006 incident. At MW-1, fifteen groundwater samples were analyzed between October 2006 and November 2009.  Benzene was detected as 560 ppb on October 24, 2006.  The concentration decreased to 5.90 ppb on November 11, 2009.  All of the other petroleum chemicals tested for (i.e. ethylbenzene, toluene, xylenes, MTBE, TMBs, and naphthalene) have been measured under their Preventative Action Limit and Enforcement Standard in all test samples taken at MW-1.

MW-2R is a monitoring well that was installed on the northwest corner of the gas station property after soil was excavated in 1997 and 1998.  At the time of closure of the historical contamination site in 1999, benzene was measured at 1.7 ppb in MW-2R, which is above the Preventative Action Limit of .5 parts per billion.  In 2006, as the spilled gas crossed the gas station site, it passed MW-2 on its way to the alley.

At the Grace building basement sump, seven rounds of sampling were conducted between April 2006 and November 2009.  Benzene was detected at 940 ppb on April 27, 2006, and decreased to .35 ppb on August 22, 2006, with all chemical compounds below the PAL. All contaminants in the Grace basement sump have been measured below both their PAL and Enforcement Standard since August 22, 2006.  Benzene was not detected in the last five rounds of testing done with the ventilation system on.  The plaintiff's expert, James Drought, testified that there were no detectable levels of petroleum volatile organic compounds (VOCs) measured in the water sample from the basement sump that was taken on February 9, 2007.

The plaintiff has been using the basement of the building for a school since the Department of Health and Family Services cleared it for use on May 1, 2006. School has been disrupted when testing needs to be conducted or when the blowers fail to function. On a few occasions, activities have been cancelled in order to investigate odors in the building.

Dr. Singh and Scott Ferguson of the WDNR monitored the emergency remedial actions conducted by the plaintiff's expert, North Shore Environmental, including the evacuation of the building, excavation of an area near the eastern footing of the Grace building to remove any potential contaminants and installation of the blower system. Dr. Singh has submitted updated plans and reports to the WDNR. John Melby of the WDNR previously has suggested the installation of a barrier wall to protect the Grace building from potential future migration of gasoline onto the Grace property. No barrier wall has been installed.

The product line under pump aisles 5 and 6 was under pressure when it was being utilized by customers during the period between April 20 and April 26. The alarm system at KJG gas station failed to function and warn the owners of the gas station that there was a leak. The gasoline which remains under the Grace building and under Grace's building footings includes some fresh (red) gasoline from the 2006 spill.

## ANALYSIS

As previously noted, in its motion for summary judgment, the plaintiff seeks a partial determination of liability under the Resource Conservation Recovery Act (RCRA), 42 U.S.C. § 6972. Additionally, defendants KJG and PSK filed their own motion for summary judgment seeking dismissal of the plaintiff's claims under RCRA.[11]

---

[11] The defendants also seek dismissal of the plaintiff's state law claims. The court considered the arguments made in their motion for summary judgment when deciding the plaintiff's motion for summary judgment.

RCRA is a comprehensive statute governing the treatment, storage and disposal of hazardous waste. City of Chicago v. Envtl Def. Fund, 511 U.S. 328 (1994). Its primary purpose is to limit the harmful effects of hazardous waste in order "to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). A citizen may bring suit under RCRA "against any person, including . . . any past or present generator . . . who has contributed or who is contributing to the past or present handling . . . of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." Id. § 6972(a)(1)(B). In Meghrig v. KFC Western, Inc., the Supreme Court noted:

> RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards. RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, "so as to minimize the present and future threat to human health and the environment."

516 U.S. 479, 482 (1996) (internal citations omitted).

A private citizen suing under § 6972(a)(1)(B) can seek either a mandatory injunction or a prohibitory injunction. Id. at 484. The former "orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste." Id. The latter "'restrains' a responsible party from further violating RCRA." Id.

To prevail on a "contributed to" claim a plaintiff is required under § 6972(a)(1)(B) to demonstrate, as is relevant to this case: (1) that the defendant was or is a generator of solid or hazardous waste; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment. Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 974 (7th Cir.

2002) (citing Cox v. City of Dallas, 256 F.3d 281, 292 [5th Cir. 2001]).

The plaintiff asserts that it is uncontested that defendants KJG and PSK have (1) generated solid or hazardous waste and (2) contributed, or are contributing, to the past or present handling, storage, treatment, transportation or disposal of solid or hazardous waste. Thus, the plaintiff seeks summary judgment as to those two elements.

The plaintiff maintains that spilled gasoline is both a hazardous and solid waste as defined by RCRA and that the act of spilling or discharging gasoline into the environment is disposal. The plaintiff asserts that there is no dispute that an underground flex coupler hose ruptured and spilled an undetermined amount of gasoline between April 20 and 26, 2006. The plaintiff also asserts that it is undisputed that subsequent to the spill defendants KJG and PSK hired Chief Liquid Waste to remove 6,000 gallons of water and free product from MW-2. The plaintiff further asserts that defendants KJG and PSK own the gas station at which the release occurred, their actions/inactions in response to the release are "handling of its solid and hazardous waste" and, therefore, defendants KJG and PSK "contributed to and continue[ ] to contribute to the handling of its solid and hazardous waste." See § 6972 (a)(1)(B).

In response, defendants KJG and PSK assert that while there is no issue of fact that there was a leak in defendant KJG's flex hose connector, there is an issue of fact as to how much, if any, gasoline escaped defendant KJG's secondary containment system into the environment such that it would constitute "solid waste." As to the second element, defendants KJG and PSK admit that, as the owner of the gas station, they contributed to the handling of the gasoline product.

The parties in this case stipulated to a number of facts for the purpose of their motions for summary judgment. While defendants KJG and PSK maintain that there is an issue of fact

as to whether any gasoline escaped defendant KJG's secondary gasoline containment system, the stipulated facts establish that a spill did in fact occur. Stipulated Fact ¶ 26 states:

> The pathway of the April 2006 spill moved northwesterly through the product lines between Pumps 5 and 6 and the underground storage tanks. The pathway then entered the alley to the north of the gas station property and transversed east through the utility lines toward the Grace Christian Fellowship property.

Moreover, Stipulated Fact ¶ 33 states that "OM Enterprises arranged for Chief Liquid Waste to pump 6,000 gallons of petroleum-contaminated water from MW-2 on August 16, 2006."

The court held a seven-day evidentiary hearing spanning a nine-month period of time. At no time did defendant KJG suggest that a gasoline spill did not occur at the gas station site in April, 2006. Defendants KJG and PSK's assertion that "a trier of fact could reasonably believe that the gasoline found in the Grace's sump originated from a third person having poured gasoline down a sewer drain adjacent to the property" is beyond reason. (Defendants Memorandum in Opposition at 27). Thus, based on the parties' stipulated facts and defendants KJG and PSK's admissions, the plaintiff has established the first two elements of RCRA. Therefore, its motion for summary judgment as to those elements will be granted.

Defendants KJG and PSK's motion for summary judgment seeks dismissal of the plaintiff's RCRA claim for the following reasons: (1) the plaintiff is unable to present sufficient evidence by which a reasonable trier of fact could find the alleged April 2006 release currently poses an imminent and substantial endangerment to health or the environment; (2) the plaintiff has not identified any specific, meaningful injunctive remedy for the court to order; and (3) the plaintiff has adequate remedies at law.

Section 6972(a)(1)(B) (RCRA 7002 [a][1][B]) permits a private party to bring suit only upon a showing that the solid or hazardous waste at issue "may present an imminent and

substantial endangerment to health or environment."  With respect to this restriction, the

Supreme Court has concluded that:

> The meaning of this timing restriction is plain: An endangerment can only be 'imminent' if it "threaten[s] to occur immediately," Webster's New International Dictionary of English Language 1245 (2d ed. 1934), and the reference to waste which "may present" imminent harm quite clearly excludes waste that no longer presents such a danger.

Meghrig, 516 U.S. at 485-86.  Therefore, "[a] private party cannot recover the cost of a past

cleanup effort under RCRA" whether the remedy is sought as "damages" or "equitable

restitution."  Id. at 488.  The plain language of 42 U.S.C. § 6972(a) "bars damages and

'deliberately limits RCRA's remedies to injunctive relief.'"  Albany Bank & Trust Co., 310 F.3d

at 974 (quoting Avondale Fed. Sav. Bank v. Amoco Oil Co., 170 F.3d 692, 694 [7th Cir. 1999]).

When originally enacted in 1976, RCRA created a cause of action for cases in which the

"disposal of any solid waste or hazardous waste is presenting an imminent and substantial

endangerment to health or the environment."  See Maine People's Alliance and Natural Res.

Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 287 (1st Cir. 2006) (quoting RCRA § 7003

[codified as amended at 42 U.S.C. § 6973(a)]).  In 1980, Congress passed the Solid Waste

Disposal Act Amendments which amended § 7003 by substituting the words "may present" for

the words "is presenting."  Maine People's Alliance, 471 F.3d at 287 (citing Pub. L. No 96-482,

§ 25, 94 Stat. 2334, 2348).

In a RCRA § 7003 case, the Court of Appeals for the Third Circuit held that "the use of

the word 'may' in RCRA § 7003 was intended to make the provision 'expansive.'"  Maine

People's Alliance, 471 F.3d at 287 (quoting United States v. Price, 688 F.2d 204, 213 [3d Cir.

1982]).  According to the court, "Congress, by enacting section 7003, intended to confer upon

courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic waste." United States v. Price, 688 F.2d 204, 214 (3d Cir. 1982).

Shortly thereafter, Congress passed the Hazardous and Solid Waste Amendments of 1984 (1984 amendments), Pub. L. No. 98-616, 98 Stat. 3221, which introduced a new provision, RCRA 7002(a)(1)(B). The new provision "extended to citizens the right to sue a polluter who may be causing an imminent and substantial endangerment to public health or the environment." Maine People's Alliance, 471 F.3d at 287 (citing Hazardous and Solid Waste Amendments of 1984 § 401, 98 Stat. at 3268-69). The Senate Report that accompanied the 1984 amendments "approvingly cited and quoted Price on several occasions, specifically endorsing that court's conclusion that section 7003 is intended to give courts the tools to 'eliminate any risks posed by toxic waste.'" Maine People's Alliance, 471 F.3d at 287 (quoting S. Rep. No. 98-284, at 59 [1983]).

At about the same time, the Court of Appeals for the Fourth Circuit decided a RCRA § 7003 case, rejecting "the proposition that 'section 7003 was designed to control pollution only in emergency situations.'" United States v. Waste Industries, Inc., 734 F.2d 159, 165 [4th Cir. 1984]). The court emphasized the statute's use of the word "may" and cited Price approvingly.

In attempting to interpret RCRA § 7002(a)(1)(B), courts look to Price and Waste Industries and the similar language found in RCRA § 7003. Although the court of appeals for this circuit has not had an opportunity to interpret the language of RCRA § 7002(a)(1)(B), other courts of appeals have done so and have construed the provision expansively. See Maine People's Alliance, 471 F.3d at 288 (citing cases); Burlington Northern & Santa Fe Ry. v. Grant, 505 F.3d 1013, 1020 (10th Cir. 2007). "The courts emphasize the preeminence of the word

'may' in defining the degree of risk needed to support RCRA § 7002(a)(1)(B)'s liability standard." <u>Maine People's Alliance</u>, 471 F.3d at 288.

The courts also agree that the word "substantial" implies serious harm. <u>Id.</u> (citing <u>Parker v. Scrap Metal Processors, Inc.</u>, 386 F.3d 993, 1015 [11th Cir. 2004]). Imminence generally has been read to require only that the harm is of a kind that poses a near-term threat. <u>See</u> <u>Maine People's Alliance</u>, 471 F.3d at 288; <u>Meghrig</u>, 516 U.S. at 485 ("An endangerment can only be 'imminent' if it 'threaten[s] to occur immediately,' Webster's New International Dictionary of English Language 1245 [2d ed. 1934]"). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" <u>Meghrig</u>, 516 U.S. at 486 (quoting <u>Price v. United States Navy</u>, 39 F.3d 1011, 1019 [9th Cir. 1994]). There is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest itself immediately. <u>See</u> <u>Maine People's Alliance</u>, 471 F.3d at 288 (citing <u>Cox v. City of Dallas, Tex.</u>, 256 F.3d 281, 299-300 [5th Cir. 2001]).

In this case, after the April 2006 incident at the KJG gas station, an investigation of the sump pump in the basement of the Grace building revealed that it contained gasoline. On April 26, 2006, the gasoline vapors coming from the Grace building basement sump caused the building to be evacuated. The plaintiff initiated an emergency response to the April 2006 spill which included soil excavation and installation of a blower to remove vapors from under the footings of the Grace building. On April 28, 2006, North Shore Environmental excavated 143 tons of contaminated soil along the west wall of the Grace property.

The plaintiff has been using the basement of the building for a school since the DHFS cleared it for use on May 1, 2006. School has been disrupted periodically when testing needs

to be conducted or when the blowers failed to function.  On a few occasions, activities have been cancelled in order to investigate odors in the building.

The air testing performed by the DHFS in November of 2006 did not "find an indoor air problem of health concern" in the Grace building.  (Stipulated Facts, Exh. 2).  On June 5, 2008, Veolia, at the direction of the WDNR, collected two indoor air samples at the Grace building using Summa canisters.  This data showed the presence of benzene, ethyl benzene and 1,2,4 trimethyl benzene.

Petroleum hydrocarbons remain under the Grace building.  In August of 2008, Shaw Environmental collected soils and groundwater samples from below the basement floor.  That testing indicated that petroleum hydrocarbons, in exceedance of the WDNR standards, existed in soil and groundwater below and adjacent to the Grace building.

Although there is evidence of petroleum hydrocarbons under, and adjacent to, the Grace building, there is a dispute of fact as to the age of those hydrocarbons.  Additionally, there is a dispute of fact as to whether the hydrocarbons are migrating into the basement air. The court previously denied the plaintiff's motion for a preliminary injunction because, at the time, there was "no evidence that any completed exposure pathway exists between the vapors under the building (or the utility trench) and the breathable space inside the Grace building." (August 7, 2009, Decision and Order at 18-19).

Dr. Hogan's expert report of February 16, 2008, summarized work he did to test air in the Grace building basement on February 12, 2008.  The report indicated that the testing revealed air polluted with petroleum contamination at concentrations as high as 11,500 ppb at a floor crack near a student's desk and noted the presence of elevated levels of benzene.  Dr. Hogan also determined that the vapors under the concrete slab of the basement matched the

chemicals found in the basement air. His report entitled "Third Addendum Report" dated June 26, 2009, indicated that a mixed gasoline contamination remained under the floor of the Grace building.

Subsequently, in August 2009, Shaw Environmental conducted vapor monitoring in the basement of the Grace building. Shaw Environmental also collected groundwater samples. On August 25 and 26, 2009, significant levels of volatile organic compounds were detected above the sealed Grace sump and in sump wells 2, 3, and 4 in the Grace basement. Shaw Environmental also took readings in the basement ventilation air flow pipes on August 27, 2009, and found high volatile organic vapor levels (up to 260 ppb) in the drywall columns surrounding the pipes leading from under the floor of the Grace building. Mr. Hogan opined that the unremediated gasoline under the Grace building pose a significant harm to occupants of the building.

A complete exposure or intrusion pathway needs to be present for vapors in the soil under a building to migrate into the air inside the building. Unlike at the time of the preliminary injunction hearing, the plaintiff has submitted some evidence that a complete exposure pathway may exist in this case. Defendants KJG and PSK take issue with the evidence the plaintiff submitted, disputing the plaintiff's experts' opinions and the testing upon which those opinions are based. The defendants maintain that Mr. Hogan's opinions are based largely on testing that was performed before the sub-slab vapor extraction system was installed in August, 2008. The remainder of Mr. Hogan's opinions are, according to the defendants, based on testing when the sub-slab vapor extraction system was turned off. The defendants further assert that Mr. Drought also improperly relies on testing that was performed while the sub-slab vapor extraction system was turned off. In addition, the defendants assert that Mr. Hogan's

testing was performed with a photoionization detector which does not identify specifically which volatile organic chemicals are being detected.

Accordingly, the court finds that there also is a factual dispute as to whether a complete exposure pathway exists and whether an imminent and substantial endangerment exists as a result of that complete exposure pathway.

In addition to asserting that there is no evidence of an imminent and substantial endangerment to health or environment, the defendants also assert that the plaintiff has no claim for injunctive relief that the court can grant as a matter of law. The defendants maintain that the plaintiff's experts have not set forth any specific and meaningful action that they want the court to order the defendants to take that has not been undertaken already which would address an imminent and substantial endangerment to health or environment. In response, the plaintiff asserts that an injunctive order will be necessary in this case.

The plaintiff maintains that because Wisconsin law requires a responsible party to investigate its site thoroughly and then provide an appropriate remedial plan, the court will need to order defendants KJG and PSK to conduct appropriate and specific remedial action. The plaintiff offers two alternative remedial actions that the court could order defendants KJG and PSK to take: 1) either install an appropriate physical barrier to break the pathway between the gas station and the church or 2) excavate the remaining contaminated soils.

Defendants KJG and PSK assert that "Grace has presented no expert who has actually recommended that either of these remedial measures should be performed to address an imminent threat to human health or the environment, let alone stated that such measures are feasible." (Defendants KJG Investments Inc. and PSK Investments LLC's Reply Brief in Support of Motion for Summary Judgment at 8). Contrary to the defendants' assertion,

however, the plaintiff has presented the June 3, 2008, letter of John H. Melby, Jr. and the December 12, 2008, letter of John J. Hnat. (October 13, 2010, Affidavit of Pamela Schaefer [Schaefer Oct. 13, 2010 Aff.], Exh. B at 5; Affidavit of John Hnat [Hnat Aff.], Exhibit C)

Mr. Melby's June 3, 2008, letter indicates that it was written after discussions among the parties. The letter and references a "low cost alternative that would address the immediate problem of vapor intrusion cause by the gasoline contamination under the church by the installation of a high density polyethylene barrier to eliminate gasoline migration impacts on Grace Church now and in the future." (Schaefer Oct. 13, 2010 Aff. Exh. B at 5). The letter further states that "[c]ontinued impacts to the Grace Church and their students from gasoline vapor are unacceptable from a safety and public stand point." Id.

A letter from Mr. Hnat dated December 12, 2008, was sent to Mr. Jagdisher Singh to notify him that the WDNR had determined to reopen the case regarding the former Mobile Oil Station (the current KJG/PSK gas station). The letter stated the following:

> As you know, there is a problem with vapor intrusion caused by the gasoline contamination that migrated from the site to underneath the church. The Department implemented efforts to begin to address this problem by installing a vapor extraction system at the church, and will likely seek cost of recovery against you for this work. Additional work is necessary to eliminate gasoline migration impacts on Grace Church. The two current venting systems, on the west and north sides, are only a temporary solution for the vapor intrusion into the basement of the church. Impacts to Grace Church and their students from gasoline vapors are unacceptable from a public health and safety standpoint. Thus, we want to emphasize that it is vital for you to implement a remedy to deal with the vapor intrusion problem as expeditiously as possible.

(Hnat Aff., Exh. C at 1). Mr. Hnat also states that "for the site investigation, additional soil borings and groundwater monitoring wells must be completed to define the degree and extent of contamination in soil and groundwater." Id. Mr. Hnat's letter confirms that, depending on

the findings of the soil borings and groundwater monitoring wells, excavation of the utility corridor may be necessary.

Finally defendants KJG and PSK assert that the plaintiff has adequate remedies at law and, therefore, its action for injunctive relief under RCRA must be dismissed. The defendants maintain that, unlike the typical RCRA case in which courts issue a preliminary injunction ordering a defendant to take action on its own property, in this case, the plaintiff can take whatever action it wants on its property and sue for damages. However, contrary to the defendants' assertion, whether the plaintiff has adequate remedies at law is only relevant when determining whether to issue a preliminary injunction, not an injunction under RCRA.

In sum, the court finds that the plaintiff has established that the defendants KJG and PSK have generated solid or hazardous waste and contributed or are contributing to the past or present handling, storage, treatment, transportation or disposal of solid or hazardous waste. Thus, the plaintiff's motion for summary judgment as to those elements is granted. The court further finds that there are material issues of fact as to whether that gasoline in the soil and groundwater on the Grace property and the gas station is creating "an imminent and substantial endangerment to health or environment." 42 U.S.C. § 6972(a)(1)(B). Therefore, the defendants' motion for summary judgment with respect to the plaintiff's RCRA claims will be denied.

## CONCLUSION

**NOW, THEREFORE, IT IS ORDERED** that the plaintiff's motion to reconsider the court's August 4, 2011, Decision and Order be and hereby is **denied**. (Docket # 287).

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment on the liability of defendants for trespass, nuisance and negligence and partial determination of

liability under RCRA be and hereby is **denied in part** and **granted in part** as stated herein.

(Docket # 224)

**IT IS ALSO ORDERED** that the defendants KJG and PSK's motion for summary judgment be and hereby is **denied**.  (Docket # 251).

Dated at Milwaukee, Wisconsin this 29th day of March, 2012.

BY THE COURT:
    s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge